Case number 22-1796 from Western Missouri, Anastasia Wullschleger et al. v. Royal Canin U.S.A. et al. Thank you. Ms. Frickleton, when you're ready. Good morning, Your Honors, and may it please the Court. My name is Kelly Frickleton, and I'll be arguing for the plaintiff's appellants. I'd like to reserve three minutes for rebuttal. You may. We're here today because three business competitors have employed a fraudulent marketing scheme in order to sell their prescription pet food to a fragmented market at an artificially enhanced price. What it means to require and to be a prescription is at the center of this case. The label carries with it an understanding that, for whatever reason, the law places a barrier to generalized sale of the product. And the only way to overcome that barrier is for a trained professional, like a veterinarian, to determine that the customer can have access to the product. A reasonable customer, faced with the need to obtain a prescription for purchase, would conclude that the barrier exists because the product includes some sort of drug, medicine, or other ingredient requiring oversight for safety and efficacy. The way a customer must buy prescription pet food, that is, directly from a veterinarian who prescribes it or from a retailer with a prescription in hand, creates for the customer the experience of buying a drug and creates the reasonable but false impression of a government-tested and approved product. But no law requires a prescription to purchase prescription pet food. Can I ask you a question? I want to back up just a second. Jurisdiction. It came before us, and the previous panel dealt with it. But I'm curious, because the complaint was massively changed and amended and removed all federal claims and almost all references to the federal claim. Did the district court even have jurisdiction by the time the complaint was amended? Your Honor, candidly, I was not involved in the amendment of the complaint, but I believe the district court does have jurisdiction based on the, I believe, diversity. I'd have to follow up with additional briefing on that question. Okay, and I can ask opposing party about it. And I'm just curious about that, because when it came up on appeal, we said there is a federal issue that's real and substantial, the Gunn and GUNN and the Grable case, but that claim is now gone. The antitrust and unjust enrichment claims are gone, replaced by a civil conspiracy claim. Correct. But, you know, if we ask for supplemental briefing, we can do that. But I understand you weren't involved with it, so please proceed. Sure, Your Honor. Back to that no law requires the veterinarian's prescription is really at the heart of the case. The defendants made up this prescription by themselves and imposed it themselves to create a guise of legitimacy and charge inflated prices for a food that does not contain any medicine or drug and has not undergone any oversight, but is, in fact, substantially the same to non-prescriptive counterparts produced and manufactured by these same companies. They use the fraudulent requirement to segment and control the prescription pet food market and drive up prices. The court below failed to accept the allegations of plaintiff's complaint as true and dismissed both the MMPA and conspiracy claims. This court should do as three other courts of appeals have and reverse. Turning first to the MMPA claim. The district court correctly found that at first glance, plaintiffs have set forth a prima facie case of MMPA violation. The court erred, however, when it took a second and third glance and instead of accepting the allegations as true, drew conclusions and made value judgments not in the light most favorable to plaintiffs, but instead to defendants. The core of the district court's order was the claim that plaintiffs lacked causation. But Missouri only requires but-for causation for these claims. But for the deceptive conduct, plaintiffs would not have been injured. Here, the deceptive conduct is requiring the prescription and really all that the prescription entails. The marketing, the housing it in a separate section of the store, all that that entails is the deceptive conduct. And it is undisputed that plaintiffs could not have purchased the food without first obtaining a prescription. What's the injury here? I mean, you mentioned there's causation. What's the injury that has to be caused by the deception? Right. So the injury or the ascertainable loss is the payment of the unjustified and artificially enhanced prices. It's not just purchasing the product. This isn't a dangerous products case. It's that the deceptive conduct has pushed the price up. And it's the payment of that differential that they wouldn't have otherwise paid had they known that it was not a lawful prescription. So your view probably then is that the district court went awry when it focused on whether or not the product would be purchased and didn't focus on the artificially high price. That's correct. So the self-imposed requirement and all that it entails misleads the customer into believing that that artificially enhanced price is justified. Prescriptions often come with a high cost. And here, when you create a product with a whole sphere of legitimacy of prescription, the customer is reasonably led to believe that that price makes sense, but it doesn't. When you look at the allegations pled in the complaint that compare the prescription food purchased by the plaintiffs, what it claims to do as far as the health benefits, and also goes in through detail that the majority of the ingredients are the same, and those that are not the same do not require any sort of prescription or oversight legally. Counsel, I think the district court also relied on what was pleaded in the complaint that at least some of the plaintiffs likely would have purchased the dog food anyway, the cat food, or would do so in the future. How does that factor in? I'm guessing you're going to say that that's inaccurate to rely on that pleading to dismiss, but where did the district court go wrong there in your view? Sure. Respectfully, Your Honor, the complaint as pled reads, there's a single paragraph that says that the plaintiffs do continue to purchase this food, but they would not have had they not known. They're now in a position where for years they've been feeding their pets this food, and any reasonable pet owner knows that that's often a difficult process to get a food that works for your pet, particularly one that's ill. The complaint actually alleges that they might, if offered another prescription, they might pursue that. It's not guaranteed. In your view, there's a clear distinction between I would not have purchased this had there not been this sort of self-imposed prescription requirement. That's different from saying I might continue to do so in the future? Well, and the point is that they wouldn't have paid the price had they known that it wasn't a prescription. They would have paid for a food that costs what normal dog food costs, rather than following the deceptive prescription requirement and being led to believe that the markup was justified. And additionally on that point, the district court went awry when it found that that fact of what's been happening since the filing of the complaint negates the years of purchases that occurred prior. In fact, the court and the defendants have pointed out that plaintiffs started purchasing the prescription pet food before they ever knew of the deception. And at least, at the very least, for that period of time from the first purchase until whenever they learned of the deception, which is something that rightfully would be developed through discovery and further litigation, that doesn't negate everything that happened in those years prior. That they were deceived and they were injured, and they are at least entitled to damages and litigation up to that point. As to the conspiracy claims, the complaint plausibly alleges that defendants acted together in furtherance of an unlawful objective, that is deceiving customers through their prescription requirement and all that it entails, after a meeting of the minds. And that's where the district court got hung up on the meeting of the minds, which is an understanding or mutual agreement between the parties and their understanding of that agreement. Everyone in this case agrees that no formal agreement is necessary for the pleading and it can be plausibly inferred from the allegations. Here, the evidence shows that a distribution agreement exists, whereby PetSmart agrees to sell the prescription pet food in the way that it has agreed to. It requires customers to obtain a prescription. It sends them to Banfield or back to their own veterinarian and says, we will not sell this to you until you have that. They're adhering to the defendant's scheme and that's evidence of meeting of the minds. What about all the other manufacturers, or not manufacturers, but sellers? Chewy, Petco, I mean the list goes on and on. Are there any allegations that they're in on this conspiracy? Chewy is listed as a civil co-conspirator. I don't believe that Petco is. As to why it matters that it happened at PetSmart, it goes to the creation of the conspiracy and the acquisition by Mars, who owns Royal Canin, of Banfield, and the real growth of the prescription pet food market when that happened. The problem is, I think it's implausible. I mean, if you don't have adequate market share on either the seller's side or the buyer's side, it's not much of a conspiracy. And that's why I ask, are all Petco and all the other ones included? But then also, on the pet food side, there's at least four other manufacturers of pet food. And are they in on the conspiracy as well? So as to the manufacturers, these three manufacturers, Hills, Mars, Royal Canin, and Purina, control 95% of the prescription pet food market. That's what's alleged. And that other 5% really has only come into existence since the conspiracy happened. And it's a very well-known phenomenon for smaller competitors to follow the big fish in what they're doing. And so they are not doing something that's unlawful. They are also being deceptive. But it's this conspiracy that controls the vast majority of the market. As I look at sort of the role the veterinarians play in all of this, and I look at what the law of conspiracy requires, it requires a meeting of the minds, and it requires some knowledge of the unlawful end. And there doesn't seem to be much pled or much information that says that the veterinarians have any knowledge of the unlawful end of this particular conspiracy. They weren't in any back room making any deals with anybody. They are not lawyers. They're not law trained. And a lot of these sales are being made directly by the veterinarians. Does that impact how we should view this conspiracy at all? No, Your Honor, because the veterinarians are still adhering to the deceptive conduct put in place by the manufacturers. That's why the manufacturers are the defendants. But they can't – yeah, they're the defendants. But can they – the conspiracy is then being advanced by all sorts of people who are just unwitting dupes. That's kind of the claim here? In particular to the veterinarians, yes, they are part of the scheme, the deceptive conduct, put in place by the manufacturers to carry out, really, the acts of prescribing it. And what evidence of unlawful end has been – of knowledge of unlawful end has been pled? It's been pled that – well, first of all, the facts that they manufacture this food that does not contain a drug or medicine that requires oversight, legally requiring a prescription. The defendants, the manufacturers, are the only people who put that in place. And they know that they do not have to require a prescription. That is pled, but they require it anyway, and it's coming specifically from them. That's the knowledge that's pled, Your Honor. And that's sufficiently detailed under our precedent? So plaintiffs take the position that conspiracy does not require the heightened 9b standard. There's only one case that was cited, and it's non-published, non-binding on this court or any other. But it is sufficient under Twombly and Iqbal. Thank you. And on the other pet food manufacturers, the other 5%, are they – for a meeting of the minds, the argument is there's no formal meeting of the minds with what's being pleaded, but that they had to go along because they own so – or they have such a small market share. The argument is that they are going along because it's to their benefit to follow the deceptive conduct of the defendants who have created the market and hold such a large share. So it's an acting in concert conspiracy, not unlike a criminal conspiracy, where if two people who don't know each other come across a person, one person shoots the victim, the second co-conspirator never enters any agreement, but after the victim's been shot, goes and stomps the guy on the head to make sure he's dead. That is then people acting in concert such that it would be a criminal conspiracy. You can infer the meeting of the minds? Certainly as to the non-defendants, Your Honor. All right. And I'd like to reserve the remainder of my time, please. You may. Thank you. Mr. Curran, when you're ready. Yes, and may it please the Court, Christopher Curran, representing Nestle Purina. First of all, I'd like to thank the Court for allowing at least to divide their argument. I intend to address the MMPA claims, and my friend, Mr. Pusher, representing Royal Canin, intends to address the civil conspiracy claim. I've got a lot to say on the MMPA, but perhaps I should start with the threshold question of subject matter jurisdiction in the district court. That'd be great. So Your Honor is right that after the remand from the Eighth Circuit, in an opinion authored by Judge Erickson, back to the district court, there was an amendment to the complaint, and there was also a motion to remand that amended complaint to the state court. And the district court concluded that there was still sufficient federal content in the amended complaint to allow continued reliance on the grable gun doctrine. And I commend the Court to the briefing and the order on that. But I have more to add on that point, because when the plaintiffs moved to remand the case to state court, they acknowledged that there was supplemental jurisdiction, even if there were no more federal claims. That concession was correct, because as a matter of pretty well-established federal law, when there are post-removal amendments to a complaint, those cannot deprive the federal district court of subject matter jurisdiction. In other words, subject matter jurisdiction is determined at the time of removal, and that can't be overcome by a plaintiff seeking to forum shop to get a case back to state court. Now, we cited in our suggestion to the district court on this later motion to remand, to a First Circuit case called Ching v. Meter, M-I-T-R-E. And that case is helpful in that it kind of has a survey of the federal circuits on this point, and it reflects this consensus, I suggest, that subject matter jurisdiction is determined at the time of removal, and subsequent amendments cannot undo that. Is it a problem, though, and I don't want to belabor this because you have a lot to say, but is it a problem that the district court didn't make the supplemental jurisdiction finding that it just said? Because I actually question whether the gun gravel analysis was sufficient, because the claim that the panel opinion relied on is gone. It's completely gone, and it's replaced by a civil conspiracy claim that's a theory of liability almost, and not even an independent claim. And so my question is, if the district court didn't make that finding, I understand there's no jurisdiction, but I want to keep the case anyways. Does that present a problem for us? Well, I don't think it does present a problem because I think your review would be de novo, and you could reach your own conclusion, and the conclusion should be that there is subject matter jurisdiction at the district court. I agree that it would have been preferable for the district court to rely on the supplemental jurisdiction, but I still think that the district court's ruling is defensible. Paragraph 34 of the amended complaint still contains a lot of federal content that we suggest and that the court seemed to conclude supplied enough for the gravel gun analysis. But I think it would have been cleaner, and we advocated that the court rely on the supplemental jurisdiction, because 28 U.S.C. 1367, I think, is the supplemental jurisdiction statute. That seems to pretty accurately apply here. And, in fact, none of the exceptions that allow a district court to have discretion to remand, none of those apply. So our argument is that not only is there subject matter jurisdiction, not only is there supplemental jurisdiction, but it's mandatory that the district court keep the case. Thank you. All right. So to the MMPA, and this is kind of picking up Judge Kelly on a question you asked my friend, the amended complaint alleges that the plaintiffs bought prescription pet food in the first instance at the recommendation of their veterinarians. The amended complaint also alleges that the plaintiffs continue to buy prescription pet food at the recommendation of their veterinarians. And it goes further to say that they intend to continue to do so in the future, and they would even buy new prescription pet food if their vets recommended it. Those allegations, which are found in the amended complaint, paragraphs 48, 55, and 62, those allegations are fatal to the MMPA claims here because, well, for a couple of reasons. The first reason, which is dispositive, is that the Missouri Supreme Court has stated in state XREL Coca-Cola versus Nixon that when a person continues to buy a product after learning of the supposed deception, that person becomes ineligible for an MMPA claim because they cannot establish that their initial purchases were as a result of the deception. But I think that their argument is, I think there's two ships passing in the night here, honestly, in terms of the theories. I think their argument is the, quote, ascertainable loss under our case law is not necessarily purchasing it because of the deception. The ascertainable loss is paying, whatever, $8 more per bag or whatever the case may be. And I'm not sure that the argument they would have bought it anyway addresses the artificially high price. Yeah, I take your point, and I heard the colloquy before, but I think we're getting to a metaphysical point here where we're trying to distinguish the increased price, the allegedly heightened price, from the transaction itself. I think they're inextricably intertwined. And the real question is, was their purchase at this allegedly inflated price the result of the deception? And it was not. It plainly was not. And as a matter of Missouri law binding on this court, it's not. The facts in Coca-Cola are quite compelling and quite analogous to what we have here, right? That was the case that involved the allegations that the Coca-Cola Diet Coke from a fountain has saccharin, whereas it doesn't when you buy it, I guess, in the can or bottle. And not only did the Missouri Supreme Court, sitting on Bonk, of course, conclude that that disqualified the plaintiffs from an MMPA claim, the court even acknowledged that many of the putative class members, in that case, wouldn't have had a choice as to other Diet Colas to buy. In other words, even if a person was somewhat compelled to make the purchases and continue to do so, they were still ineligible for an MMPA claim. So when the plaintiffs here say, oh, the only reason we're continuing to buy the prescription pet food is because we started buying it and we're reluctant to switch now, there's a lot of problems with that argument. Let me ask you this. Suppose that, to take the Coca-Cola example, suppose that it said, you know, these fountains, it said, new improved. We've got the best Coke available. Come take this Coke. And then they charge $5 more for a glass of Coke. And then the argument would be, well, I thought it was new and improved, and so I was paying for something different. It turns out I'm paying for the same thing, so I didn't want to pay the extra $5. Is that actionable or not? I think that what you just described probably is actionable. And, in fact, I think there's a case that's described in Coca-Cola that involves light cigarettes. And I think there was a case where, in fact, the light cigarettes weren't light and they had just as much nicotine as the other, and I think that was actionable. But I think that's quite distinct from a situation here. And if Your Honor is getting at the ascertainable loss point, here the allegations of the complaint reflect that there are differences between the non-prescription pet food and the prescription pet food. We could debate how significant or material they are, but there are allegations that there are different ingredients, a considerable amount, a quarter to a third different, and in different proportions and so forth. So under the Schulte case that we cite in our brief, and there I rely on both the District Court and this Court's affirmance of that, you can't have ascertainable loss when the only alleged damage is the difference between two distinct products. Counsel, can I follow up on the Coca-Cola case a bit? Because it seems to me that we're again kind of talking about a different loss here. So if the complaint alleged that it was the prescription items, the medicinal properties of this dog food, that they're saying, well, that's now missing. That sort of seems to be the same as, well, I bought this Coke, and I didn't know it had saccharin in it, right? So what's in the actual product itself? And maybe I'm sort of looping back to Judge Strasse's line of questioning, but that seems to be focused on the product. Here they're saying the loss is the extra cost I had to pay for it. Those seem to me to be different, because the Coca-Cola case was really looking at, were you injured? Well, no, apparently not, because you don't care if there's saccharin in it. But that's a different question as to, do you want to pay the extra $5 for it? Do you want to pay the extra $8 per bag? That seems to be a difference, and I'd like your response, because I don't see Coca-Cola as being so cookie cutter on top of this particular complaint. Well, I see Coca-Cola as establishing, as a matter of Missouri law, the broader proposition that if a person continues to buy a product after learning of the deception, then they cannot claim that their purchases were as a result of the deception. But it's not as whether the purchase was as the result of the deception. It's the injury, which is the extra cost, right? Because in Missouri, you don't have to have reliance, correct? So they're not alleging that we bought it because of that. We're saying we bought it, and then we didn't know we were paying too much. That seems to be different to me. Well, I read Coke a little different, but I have an additional point, too. The very fact that the plaintiffs were relying on the recommendations of the vets means that they weren't relying on representations by the defendants, including the characterization of the products as prescription pet foods. Am I incorrect about Missouri law that reliance is not required on an MMPA? Well, I don't know. I mean, causation is a required element, right? Owens establishes that, and a variety of cases establish that. The line between reliance and causation, I think, is quite blurred. I see my time. I think the cases really make that distinction between reliance and causation. Yeah, well, Coke, I think, is a causation case, and we submit that these plaintiffs cannot claim that their purchases were the result of the alleged deception, particularly when they also allege that there aren't meaningful differences. They allege that the prescription pet food is comparable or similar to the non-prescription pet food. So how can they say that they're reluctant or that their pets have become dependent on a product that doesn't contain drugs and is very similar to other products? But I think my time is up, and I don't want to eat into my friend's time. Thank you. Thank you. Thank you. Mr. Boucher. Good morning. May it please the Court. Joseph Boucher of Williams and Connolly on behalf of Defendant Appellee Royal Canin. I would like to make a couple of quick points about plaintiffs' failure to plausibly allege a meeting of the minds, and I'll start with where some of Your Honor's questioning was, which was with the role of other actors in this market. Plaintiffs' allegations fail to account for those actors, and because they are relying on this notion that because the defendants engaged in the sale of prescription pet food, it means there must have been some sort of conspiracy involved, the involvement of all of these other actors in the market shows that there is a legitimate market-based reason for selling prescription pet food by prescription. You have the veterinarians who apparently have a good faith basis for prescribing this pet food. My friend on the other side said that those veterinarians are part of this conspiracy. There's no such allegation anywhere in the complaint. You have the retailers like Petco and veterinary clinics that are not alleged to be part of this conspiracy, yet sell prescription pet food, and you have the other manufacturers that are not alleged to be part of this conspiracy, yet sell prescription pet food. The existence of all of these other actors tends to show that there is a market-based reason, independent of conspiratorial agreement, for both those actors and for defendants here to sell prescription pet food, and that is that there is an understanding that it is in the best interest of pets to have veterinarians involved in the selection of pet food for sick pets. I would like to address one other issue, and that is the timeline alleged by plaintiffs. It's a protracted timeline, and it's not consistent with parallel conduct, and it certainly does not support a plausible inference of conspiracy. According to the plaintiffs' allegations, prescription pet food was introduced in the 1960s by Hill's Pet Nutrition, and the thrust of their claim is that decades later, Royal Canin and then Purina conspired with Hill's to sell competitor prescription pet food products. That protracted timeline does not allege parallel conduct, and it certainly does not support a plausible inference of conspiracy. And it's much more consistent with the type of independent, ordinary commercial behavior that one might expect to see. Hill's introduces a product. That product finds success in the market. Then Royal Canin years later introduces a competitor product. Then a year or two later, Purina introduces a competitor product. That is not consistent with conspiracy. Thank you. Thank you. Ms. Frickleton, your rebuttal. Thank you, Your Honors. Just to make a few quick points about the MMPA discussion that was had. First, the reliance on Coca-Cola and other cases cited, including the BPA decision, are not appropriate because those cases were in a dramatically different posture than this case. We are at the pleading stage, and those had to do with class certification. Nor does the conclusion that the holding in Coca-Cola applies here, because there is no allegation or any evidence that plaintiffs purchased, from the very beginning, the product with knowledge of the deception. That's just not true, and that's not what is alleged in the complaint. Secondly, I just wanted to point out and emphasize that the arguments of defendants misconstrue this case. This is not a product case. The injury is not about what the product does or does not do. The injury is paying the artificially inflated price that is only justified by the facts that defendants impose a fraudulent marketing scheme that requires a prescription. Without paying the price, there would be no injury, and we have proven but-for causation on that. The facts are undisputed that defendants require this prescription, and plaintiffs could not have paid the artificial price without complying with that requirement. Quickly, as to the timeline of the conspiracy, we're not talking about decades. We're talking about a few years. Hills existed but did not exist in any significant way until the conspiracy, and they were all able to thrive. And for those reasons, the court should reverse and remand for further proceedings. Thank you very much. The case is taken under advisement. I appreciate that. The court appreciates your briefing and argument. They're of great assistance to us. Have a very good day, and the clerk may call the next case.